Brian S. King, #4610
Brent Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TIMOTHY D., SUE D., and M.D.,<br><br>   Plaintiffs,<br><br>vs.<br><br>AETNA HEALTH and LIFE INSURANCE COMPANY, and the KPMG LLP. MEDICAL BENEFITS PLAN<br><br>   Defendants. | COMPLAINT<br><br>Civil No. 2:18-cv-00753 EJF |

Plaintiffs Timothy D. ("Timothy"), Sue D. ("Sue"), and M.D. ("M."), through their undersigned counsel, complain and allege against Defendants Aetna Health and Life Insurance Company ("Aetna"), and the KPMG LLP. Medical Benefits Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Timothy, Sue and M. are natural persons residing in Oakland County, Michigan.

2. The Plaintiffs received health coverage under a group health benefit plan ("the Plan") sponsored by Timothy's employer. Timothy was a participant in the Plan and M. was a beneficiary of the Plan at all relevant times.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 et. seq., of the Employee Retirement Income Security Act of 1974 ("ERISA").

4. Aetna is a corporation with its principal place of business in the state of Connecticut. Aetna provides insurance and third party administrative services to a variety of individuals and businesses across the United States and does business in all fifty states. Aetna acts as third party administrator for the Plan and denied claims for treatment provided to M.

5. M. received medical care and treatment at Aspiro Wilderness Adventure Therapy ("Aspiro"). Aspiro is a licensed outdoor behavioral health provider in the State of Utah and provides treatment for adolescents with mental health conditions, and Dragonfly Transitions ("Dragonfly") a licensed intermediate transitional program in the State of Oregon.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions and the fact that Aetna does substantial business in Utah. In addition, a significant portion of the treatment at issue took place in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved. Based on ERISA's nationwide service of process provision and 28 U.S.C. § 1391, venue is appropriate in the state of Utah.

8. The remedies that Timothy, Sue, and M. seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of

2008 ("MHPAEA"), and the Patient Protection and Affordable Care Act ("ACA") an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

### M.'s History and Treatment

9. Timothy and Sue described M. as being different all of his life. As an infant, M. had trouble sleeping. He would constantly fuss and cry, and only slept in three hour intervals. M. started speech therapy at the age of two and a half because he almost never spoke. This therapy continued for several years.

10. M. was very active as a child and had difficulty getting along with other children. He started seeing a therapist at three years old. M. was enrolled in a private kindergarten with a smaller class size, but he continued to struggle. Timothy and Sue decided to have M. repeat kindergarten in the hopes that it would help him mature and be more successful.

11. In the first grade, M. was tested to determine the root of his speech issues, he was diagnosed with dyslexia which his psychologist determined to be related to situational anxiety. M.'s test scores put him in the learning disabled category. He was placed in Individualized Education Programs and was given behavioral help, but his behavior failed to improve. M.'s sleep issues also worsened in elementary school and middle school.

12. Timothy and Sue tried to get M. involved in sports and social activities like Taekwondo and sleep-away camp, but M. continued to act out and struggle socially. M. started seeing a neurologist for treatment of his insomnia and ADHD, but continued to have issues with both.

13. By the time he became a senior in high school, M. stopped caring about sports, his grades, and his physique, which up until that point were very important to him. M. graduated and

went off to college, but he lied to his parents about going to class and just stayed in the dorm all day and used marijuana. M. tried working and only taking one class, but he was still unable to succeed. He was unable to pay his rent and got kicked out of the room he was renting and started living in his car.

14. M. was evaluated at a sleep disorder facility and was diagnosed with phase delayed sleep syndrome, a condition that causes insomnia and difficulty regulating sleep.

15. After attempting to treat M. in a variety of outpatient programs without success, Timothy and Sue enrolled him in Aspiro.

## Aspiro

16. M. was admitted to Aspiro on February 29, 2016.

17. On August 19, 2016, Aetna sent Timothy and Sue a letter denying payment for M.'s treatment at Aspiro, the reviewer gave the following justification for the denial:

> After review of the information received, the specific circumstances of this member and the member's benefit plan, coverage for residential treatment is denied. Wilderness treatment programs (whether or not the program is part of a licensed residential treatment facility, or otherwise licensed institution), educational services, schooling or any such related or similar program, including therapeutic programs within a school setting are excluded. Therefore, residential treatment is not covered under the terms of the plan.
>
> (Not a Covered Service Denial) This coverage denial was based on the terms of the member's benefit plan document (such as the Certificate of Coverage or benefit plan booklet/handbook including any amendments or riders). The requested service is not covered. The plan provides limited or no coverage for this service. Please see the section of the benefit plan document that talks about what the plan covers.

Timothy and Sue verbally appealed the denial.

18. On March 16, 2017, Aetna sent a letter denying Timothy and Sue's verbal appeal. The letter stated in part:

> Based upon our review of the information provided we are upholding the original benefit determination for coverage at residential level of care for dates of service February 29, 2016 through May 31, 2016. Review of the medical chart and correspondence indicates

> you are a 22-year-old male with a diagnosis of anxiety, attention deficit disorder, and cannabis abuse. For the dates under consideration, you were medically stable. You were not actively suicidal, violent, manic, psychotic, severely depressed, or otherwise in crisis. You are cooperative with all aspects of your treatment. There is no evidence that you are a credible risk for self-harm or otherwise in crisis. You are cooperative with all aspects of your treatment.
>
> There is no evidence that you are a credible risk for self-harm or otherwise in need of 24-hour supervision and treatment. Records provide no compelling indication for care in an inpatient setting during this time, or that care could not reasonably continue safely and effectively in an outpatient setting. LOCAT criteria do not support residential treatment as the medically necessary level of care but do support intensive outpatient care. Denial is upheld. …

19. On May 12, 2017, Timothy and Sue submitted a level two appeal of the denial of M.'s treatment at Aspiro. They noted that the March 16, 2017, denial listed the wrong dates of service, they stated that the correct dates of service encompassed February 29, 2016 through May 18, 2016. In addition, the denial referenced M.'s treatment at "Dragonfly formerly known as Aspiro." Timothy and Sue stated that Dragonfly was not formerly known as Aspiro; they clarified that they are separate facilities, and that this appeal dealt with Aetna's denial at Aspiro.

20. They wrote that ERISA compelled Aetna to provide specific references to the clinical record that it relied upon to come to the conclusion to deny care, which it had failed to do. In addition, they contended that Aetna violated ERISA by not disclosing the qualifications of the reviewer. They stated that it was difficult to properly appeal the denial when such meaningful information was withheld. In addition, they asked that the next review be conducted by a board certified clinician with a specialization in adult psychiatry.

21. They argued that M. had already attempted outpatient treatment several times without significant effect, that residential treatment was the most effective treatment modality for M., and that the medical professionals who had treated M. in person recommended that he

receive a residential level of care. Timothy and Sue included some of these letters of medical necessity with the appeal.

Licensed clinical psychologist Dr. John Cotter wrote in part:

> …By the fall of 2015 [M.] was in the at-risk category and clearly required a more structured therapeutic environment that could not be met with all the above. He required a sustained intensive therapeutic milieu along with individual and group therapy. There is no doubt that anything other than residential treatment would leave [M.] floundering in the same downward spiral he was already shackled to. This was not a knee jerk response, but rather a deliberate and preconceived strategy that took place over a period of years in which all therapeutic doors were closed leaving residential treatment as an option only after less intrusive therapeutic modalities were exhausted.

Connie M. Wood, MS LLP, wrote in part:

> …After consulting with the other professionals involved, and following my review of [M.]'s symptoms, I strongly recommended that he be treated in a residential setting that could provide him with professional therapy, observation and an opportunity for psychological testing to be performed. He did not meet the criteria for acute care hospitalization, and outpatient or partial (day) hospital options were not appropriate to his needs. …

22. Timothy and Sue argued that Aetna's denial was not in accordance with generally accepted standards of medical practice. They quoted guidelines from the American Academy of Child and Adolescent Psychiatry and argued that by relying solely on its own internal guidelines, Aetna "relied upon a skewed understanding of what necessitates this level of care" and was acting contrary to industry standards and the opinions of the medical professionals that had treated M. in person.

23. On June 6, 2017, Aetna sent Timothy and Sue a letter upholding the denial of M.'s treatment at Aspiro. The reviewer wrote in part:

> …Based upon our review of the information provided we are upholding the original benefit determination for coverage at residential level of care for dates of service February 29, 2016 through May 17, 2016 and May 18, 2016 through May 31, 2016. ATV notes indicate that services were denied administratively because of facility's eligibility issues." After review of the information received, the specific circumstances of this member and the member's benefit plan, coverage for mental health residential treatment

       is denied. Mental health residential treatment programs must meet all applicable licensing standards established by the jurisdiction in which it is located. Therefore, mental health residential treatment is not covered under the terms of the plan. …

24. On March 22, 2018, Timothy and Sue wrote a letter to Aetna's appeals and grievances department in response to the June 6, 2017, denial. They argued that Aetna's denial mistakenly classified Aspiro as a residential treatment center when it was actually an outdoor behavioral health program. They stated that although the denial letter instructed them to consult the Medical Plan Exclusions section of the Plan documents, that section contained no exclusion for outdoor behavioral health programs such as Aspiro.

25. They wrote that because their plan was subject to MHPAEA, Aetna was required to offer coverage "at parity" with comparable medical care services offered by the Plan. They wrote that since Aspiro was classified as an intermediate sub-acute inpatient program, Aetna could not impose additional restrictions on M.'s treatment at Aspiro that it did not also impose on comparable intermediate programs like skilled nursing care or rehabilitation facilities. They also argued that the Patient Protection and Affordable Care Act ("ACA") prohibited companies like Aetna from discriminating against a state licensed facility like Aspiro, so long as that facility acted within the scope of its license.

### Dragonfly

26. M. was admitted to Dragonfly on May 18, 2016, immediately following his discharge from Aspiro. M.'s initial treatment plan at Dragonfly diagnosed him with:

    - F90.2 Attention Deficit/Hyperactivity Disorder, Combined Presentation
    - F41.9 Unspecified Anxiety Disorder
    - F12.20 Cannabis Use Disorder, Severe
    - F89 Unspecified Neurodevelopmental Disorder

27. In a letter dated February 2, 2017, and simply signed "Aetna," Aetna denied payment for M.'s treatment at Dragonfly. Aetna gave the following justification for denying payment:

   > After review of the information received, the specific circumstances of this member and the member's benefit plan, coverage for Mental Health Residential treatment is denied. Mental Health Residential treatment programs must meet all applicable licensing standards established by the jurisdiction in which it is located. Therefore, mental health residential treatment is not covered under the terms of the plan.
   >
   > (Not a Covered Service Denial) This coverage denial was based on the terms of the member's benefit plan document (such as the Certificate of Coverage or benefit plan booklet/handbook including any amendments or riders). The requested service is not covered. The plan provides limited or no coverage for this service. Please see the section of the benefit plan document that talks about what the plan covers.

28. On July 12, 2017, Timothy and Sue submitted a level one appeal of the denial of M.'s treatment at Dragonfly. They argued that Aetna had miscategorized Dragonfly as a residential treatment facility, when it was more aptly classified as an intermediate transitional living program. They asked Aetna to consider all denied dates of service at Dragonfly from M.'s admission on May 18, 2016, through his discharge on March 29, 2017.

29. Timothy and Sue argued that the Plan documents contained no provision for excluding M.'s treatment at Dragonfly. They again argued that because the Plan covers intermediate facilities for medical/surgical treatment such as skilled nursing care, MHPAEA prohibited Aetna from denying coverage for M.'s treatment at Dragonfly, and reiterated that ACA prohibited insurers from discriminating against any licensed healthcare provider when it was acting within the scope of its license.

30. On August 19, 2017, Aetna sent Timothy and Sue a letter in response to their level one appeal. The letter upheld the denial of care, but the rationale for denial was unclear, and the letter contained multiple formatting errors which appear to include the reviewers' notes. The "How we made our decision" section stated verbatim:

>You have requested further review because you disagree with our prior reviews.
>
>Based on a review of the member's SPD and submitted documentation regarding licensing and staffing provided by the facility, this facility does not meet criteria for a Residential Treatment Facility.
>
>Please reference your SPD under the section entitled "Residential Treatment Facility (Mental Disorders)
>This is an institution that meets all of the following requirements:
>„X ƒnIs accredited by one of the following agencies, commissions or committees
>for the services being provided: The Joint Commission (TJC), Yes Committee on Accreditation of Rehabilitation Facilities (CARF no), American Osteopathic Association¡¦s Healthcare Facilities Accreditation Program (HFAP) or the Council
>on Accreditation (COA) NO; or is credentialed by Aetna;
>„X ƒnMeets all applicable licensing standards established by the jurisdiction in which it is located; Licensed by the State of Oregon as homeless Runaway shelter, private pay. In the process in the future to get licensed.
>„X ƒnPerforms a comprehensive patient assessment preferably before admission, but at least upon admission; yes
>„X ƒnCreates individualized active treatment plans directed toward the alleviation of the impairment that caused the  admission; yes
>„X ƒnHas the ability to involve family/support systems in the therapeutic process; Yes
>„X ƒnHas the level of skilled intervention and provision of care must be consistent with the patient¡¦s illness and risk; Yes
>„X ƒnProvides access to psychiatric care by a psychiatrist as necessary for the provision of such care; yes
>„X ƒnProvides treatment services that are managed by a behavioral health provider who functions under the direction/supervision of a medical director; and Dr. Chad Brown on Staff
>„X ƒnIs not a wilderness treatment program (whether or not the program is part of a licensed residential treatment facility, or otherwise licensed institution), educational services, schooling or any such related or similar program, including therapeutic programs within a school setting. Yes, room and board take classes college  In addition to the above requirements, for Mental Health Residential Treatment Programs:
>„X ƒnA behavioral health provider must be actively on duty 24 hours per day for 7 days a week; Mentors, On call licensed therapist
>„X ƒnThe patient is treated by a psychiatrist at least once per week; and No., every 3months
>ƒn„X ƒnThe medical director must be a psychiatrist"
>
>Three complaint and appeal analysts, who were not involved in the original decision, participated in the review of the appeal.

31.     On October 9, 2017 Timothy submitted a level two member appeal of the denial of M.'s

treatment at Dragonfly. Timothy wrote that the denial letter was "terribly composed, messy,

9

and hard to parse" and made him doubt that he had been given the full, fair, and thorough review that he was entitled to under ERISA.

32. Timothy restated his rights under ERISA for Aetna to provide him with specific references to the clinical record it had used to come to the justification to deny care, and to have his appeal examined by an appropriately qualified reviewer. Timothy stated that despite pointing out that the dates of service listed by Aetna were incorrect in his first appeal, Aetna had not rectified the error. He asked that all of the denied dates for M.'s treatment be evaluated.

33. Timothy wrote that Aetna continued to classify Dragonfly as a residential treatment center, despite his assertions to the contrary, and despite the fact that the services were billed with a 1003 revenue code and not the 1001 or 1002 codes used for residential treatment billing. Timothy reiterated his arguments that Aetna had violated MHPAEA and ACA in its denials.

34. Although Timothy and Sue had submitted their level two appeal eight days earlier, and it had been nearly two months since Aetna sent out its August 19, 2017, denial letter, Aetna sent a corrected denial letter in response to Timothy and Sue's level one appeal on October 17, 2017. The reviewer gave the following revised justification for the level one denial:

> …Dates that were not reviewed under this appeal are May 18, 2016 to May 31, 2016 was reviewed [sic] under case 2017021701283 and has been exhausted and no new appeal is available.
>
> Claim Dates November 1, 2016, to March 31, 2017 were not reviewed as the claims were still pended [sic] at the time of the appeal and routed to the claims processing department for finalization.
>
> We reviewed claim dates June 01, 2016 to October 31, 2016, and our records show no authorization on file to have the claim paid at the preferred benefit level. In order for the claim to be paid, you would have needed to obtain prior approval.
>
> Based on a review of the member's SPD and the submitted documentation regarding licensing and staffing provided by the facility; this facility does not meet criteria for a Residential Treatment Facility. The original denial is upheld.

>
> Please refer to your SPD under "**Medical Plan Exclusions**" that states in part… "Not every medical service or supply is covered by the plan, even if prescribed, recommended, or approved by your **physician** or **dentist**. The plan covers only those services and supplies that are **medically necessary** and included in the *What The Plan Covers* section. … (emphasis in original)

35. On November 9, 2017, Aetna sent Timothy a denial letter in response to his October 9, 2017, level two member appeal. The letter gave the following justification for the denial:

    > - …Denial code 840- These expenses are not covered as this facility does not meet the plan definition for a Residential Treatment Facility.
    > - Denial code N72- This amount is denied. A portion of this inpatient stay was not necessary. We reduced our payment to reflect the days we authorized. You owe this amount.
    > - Denial code U03- You do not have to pay this. Part of this claim was denied, and the provider's contracted rate was reduced. This is because part of the inpatient stay could have been safely managed at a lower level of care.
    > - Denial code 921- Your benefits were paid at a reduced rate. You did not meet your plan s [sic] precertification timeframe for your stay. …
    >
    > Please be advised this final appeal decision was reviewed for June 6, 2016 to October 31, 2016. The May 18, 2016 to May 31, 2016, appeal has exhausted all internal Aetna appeal rights and the November 1, 2016 to March 31, 2017, will be reviewed a Level 1 appeal [sic] on a separate case.
    >
    > Under the Plan, residential treatment facilities must meet specific criteria for coverage. This denial of coverage is based solely upon the reasons set forth above. No other basis for exclusion (e.g., medical necessity of the service or supply) that may be applicable to the circumstances was evaluated at this time. …

36. On December 13, 2017, Sue submitted a second level two member appeal. This level two appeal was written in response to the corrected October 17, 2017, denial letter. Sue expressed concern that Aetna had divided M.'s treatment into separate time segments, and was not processing them as one admission. She wrote that the dates encompassing November 1, 2016, through March 31, 2017, which constituted nearly half of M.'s treatment, had not been addressed in any of Aetna's responses. She again asked that Aetna evaluate all of the dates of M.'s treatment, from his admission on May 18, 2016, to his discharge on March 29, 2017.

11

37. Sue alleged that her appeals had been mishandled, and that Aetna had sent her multiple responses with conflicting rationales for denial. She wrote that Aetna erroneously claimed that some of the claims were exhausted when they were not, listed some claims as pending when they should have been processed along with the other claims, and denied others due to a lack of authorization on file when the Plan did not allow for a full denial of benefits in that instance. Sue reiterated her prior arguments regarding MHPAEA and ACA, and stated that Aetna had repeatedly failed to provide her with the ERISA information she had requested.

38. On December 20, 2017, Aetna sent a letter to Timothy and Sue informing them that it would not be considering the second level two appeal letter that Sue had drafted on December 13, 2017. Aetna wrote that Timothy and Sue had already exhausted their appeal rights, despite the fact that Aetna sent them a corrected level one denial letter –containing new facts to which the December 20, 2017, letter effectively deprived them of a response– over a week after Timothy had already submitted the original level two appeal.

39. In addition, the December 20, 2017, letter contradicted the text of the corrected October 17, 2017, denial letter which stated under the heading Next Steps: "If you disagree with this decision, <u>you may request a second level appeal</u>." (emphasis in original). Despite the October 17, 2017, letter's explicit statement that a level two appeal was available, Aetna refused to consider Timothy and Sue's appeal response to that letter.

40. The Plaintiffs exhausted their pre-litigation appeal obligations under ERISA and the terms of the Plan.

41. Timothy and Sue paid over $106,000 for M.'s treatment at Aspiro and Dragonfly. These payments should have been covered by the Plan.

## FIRST CAUSE OF ACTION
### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

42. ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon plan fiduciaries such as Aetna, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

43. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1133(2).

44. The Defendants breached their fiduciary duties to Timothy, Sue, and M. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in the interest, and for the exclusive purpose of providing benefits to, ERISA participants and beneficiaries and to provide a full and fair review of the Plaintiffs' claims.

45. The actions of Aetna in failing to provide coverage for M.'s medically necessary treatment at Aspiro and Dragonfly are a violation of the terms of the Plan and Aetna's medical necessity criteria.

46. Aetna sent a corrected level one denial letter to the Plaintiffs more than a week after the Plaintiffs had already submitted their level two appeal. Despite explicit instructions in the corrected letter that a level two appeal response would be appropriate, Aetna refused to consider the Plaintiffs level two appeal response to its corrected letter. Aetna's actions violate the Plaintiffs' appeal rights under the terms of the Plan and ERISA.

## SECOND CAUSE OF ACTION
### (Claim for Violation of MHPAEA and ACA Under 29 U.S.C. §1132(a)(3))

47. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

48. The requirements of ACA also apply to the Plan through its incorporation into ERISA and preclude the ability of the Plan to restrict or exclude coverage for programs or facilities that are licensed under state law to provide the services in question.

49. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

50. Specifically, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

51. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity or medical appropriateness, and restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

52. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for M.'s treatment at Aspiro and Dragonfly include

14

sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Aetna exclude coverage for medically necessary care of medical/surgical conditions based on geographic location, facility type, provider specialty, or other criteria in the manner Aetna excluded coverage of treatment for M. at Aspiro and Dragonfly.

53. In addition, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the criteria utilized by the Plan and Aetna, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

54. The actions of the Defendants, as outlined above, have caused damage to the Plaintiffs, in the form of denial of payment for medical services rendered to M. in an amount exceeding $106,000.

55. The Defendants are responsible to pay M.'s medical expenses as benefits due under ERISA, ACA, and MHPAEA, together with prejudgment interest pursuant to U.C.A. §15-1-1, attorney fees and costs pursuant to 29 U.S.C. §1132(g).

//

//

//

//

//

WHEREFORE, the Plaintiffs respectfully request the following relief:

1. For a judgment in the total amount owed for M.'s treatment at Aspiro and Dragonfly, plus pre and post judgment interest to the date of payment;

2. For an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g); and

3. For such further relief as the Court deems just and equitable.

DATED this 20th day of September, 2018.

                                                                                                                     /s/ Brian S. King
                                                                                                                    Brian S. King
                                                                                                                    Attorney for Plaintiff

Plaintiffs' Address:

Oakland County, Michigan